## Case No. 4,085.

DRINKWATER et al. v. The SPARTAN.

[1 Ware (149) 145;[1] 3 Am. Jur. 26.]

District Court, D. Maine. June Term, 1828.

SHIPPING — CHARTER-PARTY — DEMISE OF SHIP — LIEN FOR DISBURSEMENTS — MASTER'S WAGES — ADMIRALTY JURISDICTION — OWNER'S LIEN ON FREIGHT—ENFORCEMENT.

1. A libel on a charter-party for freight due is a cause of admiralty and maritime jurisdiction; and a court of admiralty has cognizance of the cause, provided the penalty is not demanded.

2. The circumstance that the instrument is under seal, does not take away the jurisdiction which the court has over it as a maritime contract.

3. The admiralty has a general jurisdiction to enforce maritime liens.

[Cited in Gloucester Ins. Co. v. Younger, Case No. 5,487.]

4. The ship-owners have a lien on goods for the freight due for maritime transportation, which may be enforced in the admiralty by a libel in rem. And it is immaterial whether the contract is by a bill of lading, or a charter-party.

[Cited in The Rebecca, Case No. 11,619; The Gold Hunter, Id. 5,513; The Perseverance, Id. 11,017; The Volunteer, Id. 16,991; Ward v. The Panama, Id. 17,159; Thatcher v. McCulloh, Id. 13,862; The Merchant, Id. 9,434; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 420; Stone v. The Relampago, Case No. 13,486; The Maggie Hammond v. Morland, 9 Wall. (76 U. S.) 452; The T. A. Goddard, 12 Fed. 179.]

5. But where, by the terms of the contract, the charterers have the possession and control of the ship, the charter-party is not a contract for the transportation of goods, but it is a letting of the ship, and the charterers are considered as owners for the voyage.

[Cited in The Erie, Case No. 4,512; The T. A. Goddard, 12 Fed. 178. Distinguished in Shaw v. U. S., 93 U. S. 235.]

[1] [Reported by Hon. Ashur Ware, District Judge.]

6. In this case the general owners have no lien on the cargo for the hire of the ship.

[Cited in Hill v. The Golden Gate, Case No. 6,491; The Wilmington, 48 Fed. 568.]

7. Where by the terms of the contract a ship was chartered for a voyage to be made by the charterers from Portland to the Western Islands and back to her port of discharge, they to pay the expense of victualling and manning, and all port charges, &c., and to deliver her up to the owners on the termination of the voyage, it was held that the possession was with the charterers, and they were owners for the voyage, notwithstanding one of the owners was named in the charter-party as at present master.

[Cited in Eames v. Cavaroc, Case No. 4,238; Richardson v. Winsor, Id. 11,795; Donahoe v. Kettell, Id. 3,980; Leary v. U. S., 14 Wall. (81 U. S.) 607; Grand v. The Ibis, Case No. 5,682.]

8. The master has a lien on the freight for his necessary disbursements for incidental expenses, and the liabilities which he contracts for these expenses during the voyage, and also for his own wages.

[Cited in Ex parte Clark, Case No. 2,796; The Larch, Id. 8,085; The Eolian, Id. 4,504; The Atlantic, 53 Fed. 608.]

9. Where the charterers of a vessel failed before the termination of the voyage, and transferred all their property to assignees in trust to pay their creditors, including the cargo on board the ship, and it appeared that the freight due on the merchandise taken on freight was exhausted by prior claims, it was held that the master's wages were a privileged claim against the merchandise he had brought home for the charterers, and that he was entitled to a satisfaction out of it, before it went to the general creditors.

[Cited in Fox v. Holt, Case No. 5,012.]

This was a libel [by Joseph Drinkwater and others against the freight and cargo of the brig Spartan, Jacob Quincy, Charles Fox, Joseph E. Foxcroft, and Robert H. Thayer being claimants] on a charter-party, by the terms of which the owners let to freight the whole of the vessel with her appurtenances, for a voyage to be made by the charterers to one or more ports in the Western Canary and Madeira Islands, and back to her port of discharge in the United States, and to Portland. The owners covenanted that in and during the voyage she should be tight, stanch, and strong, and sufficiently tackled and apparelled for such a ship and voyage, and that it should be lawful for the charterers or their agents or factors, as well at Portland as in foreign ports, to load and put on board such loading and goods as they should think proper, contraband excepted. On the part of the charterers, it was agreed that they should pay for the full freight or hire of the brig $—— per month during the time of the service, in thirty days after the termination of the voyage, and pay the charges of victualling and manning, and all other charges, and deliver her, on her return to Portland, to the owners or their order. The charter-party is dated the 12th of September, 1827; the brig performed the voyage and returned to Portland the 25th of April, 1828, with a cargo, part of which was taken on freight, and part shipped on account of the charterers. One

of the owners is named in the charter-party as master, but he being unable to go in her when she was ready for sea, a new master was appointed. A question of fact, about which the parties were not agreed, was, by whom the new master was appointed; but it appeared from the evidence, though the owners were desirous that the person who finally went as master should be the man, that the right of appointing him was claimed and exercised by the charterers. Before the return of the vessel, the charterers having become embarrassed in their business, made an assignment of all their property, including this cargo, to Messrs. Quincy & Fox, in trust, to pay their creditors in a certain order of preference, fixed by the terms of the assignment. The property was also attached, immediately on its arrival, by several creditors of the charterers. This libel was filed for the purpose of recovering the amount due on the charter-party from the freight of that part of the cargo taken on freight, and from that part of the cargo directly which was shipped for the charterers. The master also claimed a lien on them for his wages.

Claims were interposed by the assignees, by the sheriff, and by Mr. Thayer, each setting forth their title to the property, but the merits of these conflicting claims were in a course of litigation before the state courts, and it was unnecessary to decide upon them in this case. The questions raised in this case were, first, whether under this charter the owners of the vessel had a lien on the freight and cargo for the charter, and secondly, whether the master had such a lien for his wages. They were very elaborately argued at the June term, and the case held under consideration to July 1, when the following opinion was pronounced.

Mr. Emery and C. S. Daveis, for libellants.

Mr. Longfellow, for Quincy & Fox.

Fessenden & Deblois, for Foxcroft.

WARE, District Judge. This is a libel by the master and owners of the brig Spartan, founded on the charter-party, and brought for the purpose of enforcing the stipulated hire of the vessel, from the freight and merchandise. The master and owners of the ship have united in the libel, and there was a distinct allegation by the master, claiming a lien also on the freight and that portion of the cargo which is owned by the charterers, for his wages. Whatever objections to the union of these different causes of action in one libel may exist in point of law, they were considered as waived, by the counsel, and of course the attention of the court has not been directed to this subject. The other points in the case have been argued with distingu'shed ability, and justice requires me to acknowledge the very material aid I have received in examining the case, from the thorough and acute discussion of all the questions it involves, in the learned and copious arguments of the counsel on both sides.

A preliminary objection is urged by the respondents, to the jurisdiction of the court, which must be disposed of before we can approach the case on its merits. It might be' sufficient for this court, in claiming jurisdiction over the case, to refer simply to the decision of the circuit court in the case of De Lovio v. Boit [Case No. 3,776] in which the whole learning on the vexed question of extent of the admiralty jurisdiction is completely exhausted. In that case, the jurisdiction of the admiralty over bills of lading and charter-parties is distinctly asserted, and as that was a decision of the appellate court, which has the authority to correct the errors of this, it is beyond question binding upon me, unless it has been reversed by the supreme court. The case of De Lovio v. Boit [supra] has, I know, in a recent case, been questioned by one of the judges of that court, Mr. Justice Johnson, in Ramsey v. Allegre, 12 Wheat. [25 U. S.] 611, but the court left its authority untouched. The decision, therefore, I should hold still to be binding here, if I did not in my private judgment concur, as I most fully do, in the doctrines maintained in that very learned and masterly opinion. It has been now for twelve years before the public, and though several attempts have been made to answer it, I have yet seen none in which the reasoning is met or the conclusions shaken.

The question now before me, was not then in judgment before the circuit court; and as it was not a point directly decided, the counsel for the respondent has urged the objection as one still open to argument. Without falling back on the authority of that case, I feel no objection to meet the question and give my own opinion on the point now in controversy. The argument is, that this is a sealed contract, and that the admiralty cannot take cognizance of a contract under seal. The 2 Browne, Civ. & Adm. Law, 96, is referred to as confirming this doctrine. That the courts of common law in England will grant a prohibition in such a case, is admitted. It has long been the established law of that country, and is not to be controverted. Howe v. Nappier, 4 Burrows, 1944; 1 Strange. 962; 1 Salk. 31. But I consider it as equally well established, that the decisions of the common law courts in England, as to the limits and extent of the admiralty jurisdiction, have not an authority in this country beyond the reasons on which they are founded. Every admiralty court in this country probably, most of them certainly, have in repeated instances taken cognizance of cases in which a prohibition would go in England. Without multiplying citations, I will refer to one or two only. The case of The General Smith, 2 Wheat. [15 U. S.] 432. was a suit by materialmen, and not the slightest doubt was expressed of the jurisdiction of the court. It was again positively and distinctly asserted over that class of causes in The St. Jago de Cuba. 9 Wheat. [22 U. S.] 409. Yet it is per-

fectly clear that a prohibition would go in these cases to the high court of admiralty. The contract is both made and executed on land, and within the body of a county, either of which circumstances is held to be conclusive, by the courts of the common law, against the admiralty jurisdiction. This court must, therefore, in deciding this point, be governed by the nature of the case, and the decisions of our own courts. No case directly in point has been cited at the bar or is recollected by me.

The first thing to be considered in deciding the question, is the subject-matter or consideration of the contract, whether maritime or not. It is the hire of a vessel for maritime service, and the whole service, from its inception to its termination, is on the high seas. The judiciary act (2 Laws U. S. c. 20, § 9) gives to this court "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction." I shall be glad to hear any definition of causes of admiralty and maritime jurisdiction which will exclude this. The counsel do not, however, put their objection on this point. They rely on the fact that the contract is under seal. But if the jurisdiction attaches to the subject-matter, is it defeated by the peculiar form which the parties have chosen to give to their contract, by annexing to it a seal? The reason given by the common law courts of England, for ousting the jurisdiction of the admiralty in such cases, is, that this court is governed by the civil law, and requires two witnesses to prove a deed, when the common law is satisfied with one. Smart v. Wolff, 3 Term R. 348, per Justice Buller. If that is the rule of the admiralty in England, it may be a good reason for prohibiting the court from taking cognizance of sealed contracts. In this country. a deed is proved in the admiralty by the same evidence that is held to be sufficient by the courts of common law, and is interpreted by the same rules. The reason, therefore, which may be good in England, fails here, and "cessante ratione cessat lex." Yet the rule is flexible in England, for there the admiralty has an undisputed jurisdiction over bottomry bonds. In fact, though Browne, in the place referred to in the argument, does state the law of England to be as is contended, that is, that a prohibition will go from the common law courts; yet in a subsequent part of the same chapter he says, that if a suit is instituted in the admiralty on a charter-party for freight, he does not see how the court could refuse to entertain it (page 122); and the Case of The Jenny, cited in the same volume, which was a decision of the court of admiralty in Ireland, is directly in point to sustain the jurisdiction (page 535). The court ruled that the jurisdiction of the admiralty was excluded only when the penalty was sued for.

But there is another ingredient in this case which I hold to be conclusive in favor

of the jurisdiction. I yield to the argument, which was very forcibly urged in another case as well as in this, that this court has a general jurisdiction to enforce maritime liens. I assume the fact in this stage of the inquiry, which is supposed by the suit, and on which it rests as its only foundation, that a lien is created by the maritime law. If there is here an implied hypothecation raised by the law, it can be enforced by no other than an admiralty court. It is a right adhering to the thing, a jus in re, which is to be made available by process against the thing in specie. It was admitted by the learned counsel for the respondent, that the course of the common law allows of no process upon the hypothecation by which the subject itself is directly reached and a satisfaction for this right extracted from it. If a court of admiralty cannot entertain jurisdiction of the case, then the law has given the right, it has provided the security, but has refused the only means by which it can be rendered with certainty available. It holds out the right, and holds back the remedy. The libellants assume the fact that theirs is a privileged debt, and for the decision of this point in the case it must be admitted to be true. They claim the right to be paid out of the property for which the service has been rendered, and by which its value has been augmented, before any part of it goes to the general creditors. And when they apply to the only court which can put them in possession of their rights, shall they be told that this court has no jurisdiction of the case? Shall they be told that the law sanctions their privilege and holds it sacred, but refuses to them the power to enforce it? Until I am otherwise instructed by the authority of a higher court, I shall not willingly admit that the law thus "palters in a double sense, and keeps the word of promise to the ear, while it breaks it to the hope." On the contrary, where the law raises a lien for maritime service, I hold that this court has the power to carry it into effect.

We come then to the case on its merits. The general right of the master and owner to retain the merchandise for the freight due upon it, has not been denied. It is too well established to admit of doubt. It is a principle of the general maritime law, the common law of the commercial world, sanctioned by all the maritime codes, ancient and modern, and confirmed by numerous decisions of the highest courts, both in this country and England. Nor does there appear to be any difference in principle, nor is any recognized in law, whether the merchant takes the whole vessel by a charter-party, or sends his goods in a general ship. The lien of the owners is as perfect for the hire of the vessel stipulated in the charter-party, as it is for the freight stipulated in the bill of lading. In both cases the claim is privileged in the same degree and to the same ex-

tent. They are contracts of the same general nature, differing only in some unimportant particulars. A charter-party is for the whole or a large or specified part of the vessel; a bill of lading is usually for a smaller and an indeterminate portion of the vessel's capacity. Both contracts, in one aspect, are the hire of the whole or a part of a vessel; both, in another, are contracts for the transportation of merchandise. Boucher, Droit Maritime, par. 879. In both cases the owner is the carrier, and he has a lien on the merchandise for the transportation.

There are, however, two kinds of contracts passing under the general name of "charter-party," differing from each other very widely in their nature, their provisions, and in their legal effects. In one, the owner lets the use of his ship to freight, he himself retaining the legal possession, and being liable to all the responsibilities of owner. The master is his agent, and the mariners are in his employment, and he is answerable for their conduct. The charterer obtains no right of control over the vessel, but the owner is in fact and in contemplation of law the carrier of whatever goods are conveyed in his ship. The charter-party is a mere covenant for the transportation of merchandise or the performance of the service which is stipulated in it. In the other, the vessel is herself let to hire, and the charterer takes her into his own possession. It is a contract for a lease of the vessel. The owner parts with possession and the right of possession, and the hirer has not only the use but the entire control of the vessel herself. He becomes the owner during the term of the contract. He appoints the master and mariners, and is responsible for their acts. If goods are taken on freight, the freight is due to him, and if, by the barratry or other misconduct of the master or crew, the shippers suffer a loss, he must answer for it. If he ships his own goods, he is his own carrier.

Under a charter-party of the former description, the charterer may hire the use of the whole vessel, and it may be employed in carrying his own goods, or the goods of other merchants on freight. His own goods become liable to the owner of the vessel for the charter, to the full extent of their value, and though he is entitled to the freight of the goods shipped by the sub-freighters, the owner of the ship has a lien on that freight for the charter of the vessel; and his lien extends to the goods of each sub-freighter for the amount of freight due on his shipment. This was the decision in the case of Paul v. Birch, 2 Atk. 621, and it has ever since been held to be law. Holt, Shipp. 471. It is so recognized in Christie v. Lewis, 2 Brod. & B. 410, and in Faith v. East India Co., 4 Barn. & Ald. 630.

In a charter-party of the second kind, not only the entire capacity of the ship is let, but the ship itself, and the possession

is passed to the charterer. The entire control and management of it is given up to him. The general owner loses his lien for freight, but the lien itself is not destroyed; the charterer is substituted in his place, in whose favor the lien continues to exist when goods are taken on freight. But the general owner has no remedy for the charter of his vessel, but his personal action on the covenants of the charter-party. It is a contract in which he trusts to the personal credit of the charterer. These principles appear to be firmly established by the cases cited at the argument. It was on this principle that the case of Hutton v. Bragg, 2 Marsh. 339, was decided; and afterwards that of Master, etc., of Trinity House v. Clark, 4 Maule & S. 288. The authority of these cases, especially the former, was indeed powerfully attacked in the very able argument of the libellant's counsel, and it may be considered as in substance overruled by that of Saville v. Campion, 2 Barn. & Ald. 503, and still more decisively in that of Christie v. Lewis, 2 Brod. & B. 410. But on an examination of the cases in which the authority of Hutton v. Bragg [supra] has been called in question, it will be found that they have rather overruled the case than the principle. The application of the principle, as made in that case, has been shaken, and not the rule of law which the court professedly assume as the ground of their decision. The principle is, that when the owners let the entire ship and part with the possession, they lose their lien for freight. The application of the principle is, that when the owners let the whole ship, or nearly the whole, by a charter-party, containing certain technical terms of demise, the legal possession passed to the charterers, notwithstanding the general owner appointed and paid the master and crew. The court interpreted this to be a contract, not for the transportation of goods, but for the lease of the vehicle. The Case of the Trinity House, though agreeing in the terms of the charter-party with that of Hutton v. Bragg, is distinguished from it in the nature of the service for which the ship was hired, and may well be defended on its own peculiar circumstances. But the case of Christie v. Lewis agrees in all its material facts with Hutton v. Bragg, yet the court, Dallas, C. J., dissenting, reversed the decision and held that the owner retained his lien. But it was so ruled on the express ground that the owner retained the legal possession of the ship by his master and crew. In this case, as well as in that of Faith v. East India Co., it is clearly admitted that when the owners part with the possession, they lose their lien. The principle of Hutton v. Bragg remains untouched, but the rules of interpretation applied to the charter-party in that case are overturned. All the English cases are reviewed by Holt, in his Law of Shipping, 460–471, and the result of the whole is, that

a ship may be so let to hire as to constitute the charterers owners under the charter-party, provided such appears to be the intention of the parties; and that this intention may be collected either from the necessary construction of the terms of the instrument, or from the nature of the service for which she is hired. But the right of the owner is strongly favored, and while he appoints the master and crew, his lien for freight can only be excluded by the most express and absolute terms of the charter-party, or by unavoidable implication. But there is no case where the owner's lien has been sustained, unless where he has retained the possession by the appointment of the master.

No American case was cited in which this point has come up directly in judgment. But in Kleine v. Catara [Case No. 7,869] Mr. Justice Story expressed a decided opinion that where the charterer becomes owner for the voyage, the general owner has no lien for the freight, but that the rule is confined to cases where the carrier for freight is owner for the voyage. I think it clear, both in principle and authority, that where the owner parts with his possession, he parts at the same time with his lien.

This case, therefore, must turn wholly on the question whether the general owners, or the charterers are to be considered as owners for the voyage, and as having possession of the ship. The language of the charter-party leads very clearly, if not unavoidably, to the conclusion that this was a letting of the ship. Violence must be done to several parts of it, before it can be interpreted into a contract on the part of the owners for the conveyance of goods. It is not simply a letting of the whole ship; this, it is admitted, would not alone be conclusive, but she is let for a voyage to be made by the charterers. The owners covenant, not that they or their master will receive and load the merchandise provided by the charterers, but that it shall be lawful for the Quincys or their agents to load her; and the charterers agree, not only to pay the charter, but also the charges of victualling and manning, and all other charges, and finally, after she has performed the voyage, to deliver her up to the owners. It would seem that language more expressive and significant of an intention on the one side to part with the possession, and on the other to take the possession of the ship, could scarcely be found. How could the charterers perform their covenant to deliver up the possession to the owners after the voyage was completed, if the possession was not to be in them during the voyage?

The libellants rely on the fact that one of the owners is named in the charter as at present master, as a circumstance showing that it was the intention of the owners not to part with the possession. If the intention, as collected from the operative parts of the instrument, was doubtful, this might be entitled to weight,

and the inclination of a court to support the equitable lien of the owners, would give it all the weight it could justly have. But this of itself is not sufficient to control the general tenor and whole apparent intent of the charter-party. The appointment of the master and crew by the owners, is not in all cases conclusive, though they may also be paid by them. As is remarked by Lord Ellenborough, in the case of Master, etc., of Trinity House v. Clark, the vessel may be hired, and with it the services of a certain number of persons paid by the owners, and necessary to the use of the vessel. In point of fact, however, the master named in the charter-party did not go the voyage, though it was the intention of both parties that he should.

The libellants offered to introduce parol proof that the new master was appointed by the owners, but the counsel on the other side objected to the admission of this species of evidence to control the operation of the charter-party. The testimony was received, de bene esse, subject to the respondents' objection. It is unnecessary to decide on the influence which this fact ought to have, if proved, on the construction of the written agreement. The evidence in support of it is at best but loose and vague, while that by which it is met on the other side is direct and positive, that the new master was appointed by the charterers. Upon this part of the case, my opinion is that the libel cannot be supported; that the owners parted with the possession of the vessel, and constituted the charterers owners for the voyage, and that they have, therefore, no lien on the cargo for the charter. So much of the libel as claims a lien for the charter, is dismissed. This, of course, can be no bar to any right of action which the owners may have personally against the charterers or their assignees. This view of the question being in my opinion decisive, renders it unnecessary for me to examine other points which were made and strongly urged in the defence.

The master also claims in this libel a lien on the freight and cargo, that is, on that part of the cargo belonging to the charterers, for his own wages and as an indemnity for his liability to the crew for their wages. The decree, which has just now been made on the libel of the seamen, is, I think, a sufficient answer to the claim of a lien as an indemnity. Whatever his rights may have been in this respect, that decree, it appears to me, must be held at present as a full protection against his liability to the seamen. Upon his claim for his own wages, I have found more difficulty in coming to a conclusion satisfactory to my own mind, than on any part of this case; and the opinion which I have adopted as most reasonable and equitable, I do not profess to hold free from all doubt. The books are extremely barren of authorities on this point.

It is a well settled principle of law in this country that the master has no remedy for his wages against the vessel. Whether this be a principle of the general marine law, may perhaps admit of doubt. By the law of France, the master is allowed the same privilege against the ship for his wages, and in case of misfortune, against the savings from the wreck, as the seamen. This is the provision of the Ordinance de la Marine, L. 3, tit. 4, arts. 8, 21; 1 Valin, 701, 752; and this provision is continued in the Code Napoleon (Code de Commerce, 352). I cannot see on what principle of justice or policy the master is to be excluded from all benefit from the savings from a wreck, while the right of the crew is admitted. But the general principle is too firmly established in this country, to be called in question. The Grand Turk [Case No. 5,683]; Gardner v. The New Jersey [Id. 5,233]. One reason assigned for making this distinction against the master, is, that he contracts on the personal responsibility of the owners. But this, instead of a reason, is manifestly little more than another mode of stating the principle. Another, and a more satisfactory reason given is, that he is the proper person to receive the earnings of the ship, and pay them over to those to whom they of right belong (Gardner v. The New Jersey [supra]); and that he has a lien on this freight for his own wages (The Grand Turk [supra]). He is intrusted with the control and management of the vessel, as the confidential agent of the owners, and is often, in the course of the voyage, called upon to incur responsibilities and make advances in the ship's service for their benefit. It is a necessity which arises from the nature of his employment. In cases of imperious and overruling necessity, he may hypothecate the ship, and even the cargo; but it is very questionable, at least, whether he must not first exhaust his own means and credit before he can resort to this extraordinary and onerous mode of relief. The Hero, 2 Dod. 139; Holt, Shipp. 342. 343; Jac. Sea Laws, 354. Besides these incidental responsibilities, he is, according to universal usage, by the very terms of the contract, made directly answerable to the seamen for their wages; and this is in conformity with a rule of the marine law, as old as the law itself. On what principle could this rule have been so universally established, but this plain and sensible reason, that the captain is entitled to receive the freight, the common fund out of which not only wages but every other ordinary charge on the voyage is to be paid. In the case of Goodridge v. Lord, 10 Mass. 487, it is said by the court that the captain may retain freight in his hands to pay the seamen's wages; and in that of Lane v. Penniman, 4 Mass. 92, it is ruled, Chief Justice Parsons giving the opinion of the court, that he has a lien on the freight for the necessary disbursements which he makes during the voyage, which takes precedence of the owner's title to it. This decision is fully supported by that of White v. Baring, 4 Esp. 22. Roccus, note 31,

is full to the same point. The captain had rendered himself liable for the amount of some repairs which became necessary in the course of the voyage, and the owners had become bankrupt before its termination. The shippers, after notice had been given them by the master of his demand against the freight, paid it over to the assignees of the owners. The master brought a suit against them, for the amount of his liabilities, and also for his primage, which was purely a personal demand due to him as master. Lord Kenyon said that the captain "having contracted and rendered himself personally liable for articles furnished the ship, he thereby acquired a lien on the goods as well as freight, that his lien is coextensive with his liabilities to the ship's creditors, and of course the payment made by the defendants was made in their own wrong." Lord Kenyon, in the short abstract of his opinion, avoids touching on the claim of primage, and in the brief report of the case it does not appear whether this was or was not included in the verdict.

I have no doubt of the soundness of the doctrine of these cases. Why does not his prior right for his wages rest on as good ground as for his liabilities or disbursements? The money is as much due to him in one case as the other, and the credit has in each grown out of the same service, a service which has contributed to create the fund against which his claim is made. I can see no sufficient reason for making a distinction between them. His wages are as much a charge on the earnings of the ship as those of the seamen, or as the advances which he makes for incidental expenses. What remains, after these are discharged, constitute the net freight of the owners. Besides, if the reason given for excluding the master from admiralty process against the ship, that he has a lien on the freight, means any thing, it means that he is a privileged creditor against the freight. A lien ex vi termini imports a privilege. If it is not this, it is nothing. Upon the whole, finding that he has a lien on the freight for his disbursements, and seeing no reason in law or justice for making a distinction between this claim and that for his wages, I do not feel the authority for introducing a distinction against him which I do not find established.

But in point of fact, the freight on the goods taken on freight had been attached, before the filing of this libel, by the seamen, and a decree has passed in their favor which will absorb the whole fund. This necessarily brings up the other question, whether the master's lien for his wages extends to the merchandise of the owners, which he has brought home. Without touching this as a general question, I put my opinion on the peculiar facts of the present case. The charterers here are the owners for the voyage. The master is hired by them, and is in their employment. He fulfils his part of the contract, and performs the voyage successfully, but when he arrives in safety, bringing with him his whole earnings for seven months' service, he finds that his employers, two months before the service is completed, without making any satisfactory provision for his wages, had assigned their whole property, including what was in his hands, for the benefit of their general creditors. It was, in effect, not only an assignment of all his wages earned up to the time of the assignment, but of all the additional wages which would accrue to the completion of the voyage. He is named, it is true, as a creditor, in the assignment, but his claim is postponed to several more favored creditors for a large amount; in the mean time the fruits of his service are taken out of his hands, and he is left to pick up a satisfaction from the remnants of an insolvent estate. This is certainly a case of very strong equity, but it is admitted that the books contain no decision in point to sustain the master's claim. In the argument it was compared to the lien of a factor for his commissions, and to the vendor's right of stoppage in transitu, on the insolvency of the purchaser. It has some points of analogy and some points of difference with both these cases. It is like the factor's lien, inasmuch as the goods are in his hands, and the claim is for a meritorious service to these goods; and it is assimilated to the vendor's right of stoppage in transitu by the insolvency of his employers, with this distinction in his favor, that the possession is with him, and he retains all the priority over other creditors which that can give. His case may also be likened to the lien which an artisan has, for his pay, on the particular thing about which he has expended his labor and skill, an equitable lien, which is always favored in law. It is repugnant to all our ideas of equity that the master should be required to part with these goods to the creditors of his employers, claiming either under the assignment or attachment, until he has a compensation secured to him for the time, labor, and diligence which he has bestowed for the benefit of this identical merchandise. It is, on the principles of natural justice, a charge on the specific goods, and the owner, on his insolvency, cannot, consistently with these principles, assign them but subject to the charge. Sitting in a court, which, while it adheres to the principles of law, is required by its duty to decide ex aequo et bono, and by its constitution is enabled to deal with the cases falling within its jurisdiction in a larger and more liberal spirit of equity than the severe and technical rules of the common law will admit, after the most diligent examination which I have been able to give the case, I have come to the conclusion that I can do justice between the parties, without impugning any of the rules of law, but consistently with those rules, and I accordingly decree in favor of the libellants' lien.